MATTSON v FARMERS INSURANCE EXCHANGE

Docket Nos. 99200, 99463. Submitted December 8, 1988, at Lansing. Decided December 18, 1989. Leave to appeal applied for.

Glen Mattson, guardian of Gregory Mattson, a legally incapacitated person, brought an action for no-fault benefits for injuries suffered when Gregory threw himself in front of oncoming traffic. The Attorney General and the Department of Social Services intervened as plaintiffs and agreed to allow the court to resolve their claim after trial on Mattson's complaint. At trial, three psychiatrists testified that Gregory Mattson lacked the mental ability at the time of the injury to form an intent to injure himself. Gregory testified that his intent was to kill himself. The Oakland Circuit Court, Richard D. Kuhn, J., granted a directed verdict for defendant. Mattson appealed. The Attorney General and Department of Social Services appealed. The appeals were consolidated by the Court of Appeals.

The Court of Appeals *held:*

1. Injuries suffered intentionally by the injured person are not accidental and are not covered by no-fault insurance. Where a person could not form an intent to act because of insanity, he has not acted "intentionally" as that term is used in insurance policies. The evidence as to Gregory's mental state at the time of the injury was conflicting. The court erred in granting a directed verdict.

2. The issue of the inadmissibility of certain evidence was not preserved for appeal because the grounds raised on appeal were not raised at trial.

Reversed and remanded.

1. MOTIONS AND ORDERS — DIRECTED VERDICT — APPEAL.

REFERENCES

Am Jur 2d, Automobile Insurance §§ 191, 351, 355, 356.

See the Index to Annotations under Accident or Accidental; Automobile Insurance; Incompetent and Insane Persons; No-Fault Insurance; Pedestrians.

from in the light most favorable to the plaintiff and determine whether the evidence was sufficient to establish a prima facie case; if reasonable jurors could honestly have reached different conclusions, then the motion should have been denied since no court may substitute its judgment for that of the jury.

2. INSURANCE — NO-FAULT — INTENTIONAL INJURIES.

Injuries suffered intentionally by the injured person are not accidental and are not covered by no-fault insurance; under the applicable standard, it is whether the result was intended that determines whether the injuries were intentionally suffered.

3. INSURANCE — INTENT — INSANITY — JUDICIAL CONSTRUCTION.

Where a person could not form an intent to act because of insanity, he has not acted "intentionally" as that term is used in insurance policies.

*Bebout, Potere, Cox & Hughes, P.C.* (by *Francis P. Hughes*), for plaintiff Glen Mattson.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Bernard Rosner,* Assistant Attorney General, for intervening plaintiffs Attorney General and Department of Social Services.

*Wheeler, Upham, Bryant & Uhl, P.C.* (by *Gary A. Maximiuk*), for defendant.

Before: DANHOF, C.J., and HOOD and R. L. TAH-VONEN,* JJ.

R. L. TAHVONEN, J. In this no-fault case, the trial court directed a verdict for defendant Farmers Insurance Exchange at the close of plaintiff Glen Mattson's proofs. Plaintiffs appeal as of right and we reverse.

On February 20, 1983, Gregory Mattson, then twenty-one years old, ran into a city street, threw himself in front of several automobiles and suffered serious injuries as a result. Throughout that

---

* Circuit judge, sitting on the Court of Appeals by assignment.

day, Gregory had been staring into space, talking to furniture, remarking that he saw birds in the house and mumbling nonsensically. The psychiatrist who had been treating him since October of 1982 recommended by telephone that Gregory be committed. Gregory's parents and a neighbor, George Bowen, took Gregory to the Common Ground Clinic in Birmingham. Dr. David Gendernalick, a psychiatrist there, examined Gregory and discovered that Gregory could not remember his name or age without looking at his driver's license. Dr. Gendernalick recommended that Gregory be committed. Gregory was taken to the Pontiac General Hospital emergency room at about 6:30 P.M. Due to confusion caused in part by a shift change, Gregory remained in the emergency room area until about 9:45 P.M. On several occasions during this period, Gregory went outside to smoke, accompanied by a parent or Mr. Bowen, the neighbor. On the last occasion, Gregory went out alone. Mr. Bowen followed him, did not see him and came back inside to look for him. A young girl came into the emergency room and reported that Gregory had run into the street and had been struck by several cars.

Glen Mattson (hereinafter plaintiff), Gregory's father, guardian and conservator, applied for no-fault benefits from Farmers, which denied benefits on the basis that Gregory's injuries were suffered intentionally and were, therefore, excluded from coverage pursuant to the terms of the policy and MCL 500.3105; MSA 24.13105. Mr. Mattson, on behalf of his son, sued Farmers, alleging that it breached the insurance contract by not paying benefits. The Attorney General and the Department of Social Services intervened as plaintiffs to protect the department's interest in Medicaid payments made on Gregory's behalf. The parties

agreed that the court would resolve the state's claim after trial on plaintiff's complaint.

The case was tried before a jury in January of 1987. Plaintiff presented testimony from three psychiatrists, all of whom said that on February 20, 1983, Gregory lacked the mental capacity to form the intent to injure himself. Plaintiff also offered Gregory's medical records with the exception of "all references by Gregory to his mental or emotional state on February 20th . . . ." Farmers objected to this deletion, arguing basically that Gregory's comments to the nurses and doctors were statements by a party opponent and therefore admissible under MRE 801(d)(2)(A). The trial court admitted the records, including Gregory's statements to the effect that he had tried to kill himself on February 20, 1983, by hurling himself into the path of oncoming traffic.

At the close of plaintiff's proofs, Farmers moved for a directed verdict. The trial court granted the motion, saying:

> In this case, the Court finds, in no uncertain terms, that Plaintiff intentionally caused the acts which resulted in his injuries. The Plaintiff ran in front of moving vehicles on, at least, three separate occasions.
>
> The Plaintiff told the nurses and medical personnel that he wanted to commit suicide. Therefore, the Court finds that the Plaintiff's injuries are the intended result of an intentional act. The Court, therefore, grants Defendant's motion for directed verdict.

Post-judgment motions challenging this grant of a directed verdict were denied. Plaintiffs appeal.

When reviewing a trial court's ruling on a defendant's motion for directed verdict, this Court must view all the evidence, and the legitimate

inferences from it, in a light most favorable to the plaintiff and decide whether that evidence establishes a prima facie case. *Bonelli v Volkswagen of America, Inc,* 166 Mich App 483, 514; 421 NW2d 213 (1988), lv den 430 Mich 896 (1988). If factual issues remain upon which reasonable minds could honestly differ, those issues should be left to the jury. *Id.* The directed verdict here was based on the trial court's conclusion that Gregory intended to kill or injure himself and therefore was not entitled to no-fault benefits. The issue is whether all reasonable jurors would agree with that conclusion if the evidence is viewed in a light most favorable to plaintiff.

The goal of the no-fault insurance system is to provide victims of automobile accidents with assured, adequate and prompt payment for economic losses. *Shavers v Attorney General,* 402 Mich 554, 578-579; 267 NW2d 72 (1978), reh den 403 Mich 958 (1978). However, injuries suffered intentionally by the injured person are not accidental and therefore not covered. The no-fault statute provides:

(1) Under personal protection insurance an insurer is liable to pay benefits for accidental bodily injury arising out of the ownership, operation, maintenance or use of a motor vehicle as a motor vehicle, subject to the provisions of this chapter.

* * *

(4) Bodily injury is accidental as to a person claiming personal protection insurance benefits unless suffered intentionally by the injured person or caused intentionally by the claimant. Even though a person knows that bodily injury is substantially certain to be caused by his act or omission, he does not cause or suffer injury intentionally if he acts or refrains from acting for the purpose of averting injury to property or to any person including himself. [MCL 500.3105(1) and (4); MSA 24.13105(1) and (4).]

In *Frechen v DAIIE,* 119 Mich App 578; 326 NW2d 566 (1982), this Court held that injuries which are the unintended result of an intentional act are accidental and therefore compensable under the no-fault act. In that case the claimant unsuccessfully attempted to persuade his wife to drive him home from a bar they had jointly patronized for the best part of a day by climbing onto the hood of their car as she drove off. Although the car was traveling at only two miles per hour when the ill-fated voyager hopped aboard and although his wife immediately applied the brakes, the claimant slid off the front of the car and suffered injuries when struck by the right front tire. We concluded that the no-fault act created a subjective standard which must be applied to determine if the particular claimant intended to suffer or cause the injury or death for which benefits are sought. Only if such an untoward *result* was intended can it be concluded that the injury or death was not accidental and hence was excluded from coverage.

The *Frechen* view is consistent with the Supreme Court's recent reference, in connection with some intentional injury exclusions in homeowners' policies, to Michigan authority holding that "an insured must subjectively intend both his act *and* the resulting injury in order to avoid its [the insurer's] duty to defend and indemnify." *Allstate Ins Co v Freeman,* 432 Mich 656, 672; 443 NW2d 734 (1989). However, even in those cases utilizing a subjective test of intention, "[w]here the injury or resulting death is the natural, anticipated and expected result of an intentional act, courts may presume that both act and result are intended." *Transamerica Ins Co v Anderson,* 159 Mich App 441, 444; 407 NW2d 27 (1987).

In the case now before us, the link between

hurling oneself in front of moving cars and injury is obvious and necessary—to the rational mind. But the statute calls upon us to consider only Gregory Mattson's mind, and the evidence is plain that his was not a rational mind on February 20, 1983.

Dr. Napoleon Franco was Gregory's treating psychiatrist beginning in October of 1982. He last saw Gregory on February 7, 1983, thirteen days before the occurrence giving rise to this lawsuit. Dr. Franco testified that, on the 7th, Gregory "was becoming psychotic, hallucinating, delusional" and the "prognosis did not seem good" because Gregory "tended to stop taking medication." As to Gregory's mental state when he threw himself in front of the cars, Dr. Franco opined:

> In my professional opinion I think that he was psychotic last time I saw him and from the knowledge I have he was still psychotic at the time of the accident and he was not capable of forming in his mind a rational intent for action.

After rather lengthy and unenlightening dialogue with the attorneys involved, Dr. Franco indicated that an intent was "rational" if it was the product of one not mentally ill. Since Gregory was mentally ill and since his acts were the product of that mental illness, his intent could not be "rational" as that term was used by Dr. Franco.

Dr. David Gendernalik, another board-certified psychiatrist, testified that he examined Gregory at about 6 P.M. on February 20, 1983, and certified that he was then a person requiring treatment under the Mental Health Code, MCL 330.1001 *et seq.*; MSA 14.800(1) *et seq.* Dr. Gendernalik opined that suffering injuries

> was not an intentional act as the word is normally

used. A person who is acutely schizophrenic and acutely psychotic is probably not capable of any significant degree of intent . . . and that Gregory was hallucinating, and as I said, he said over and over again that he was confused and that he had a great difficulty answering questions, so I had the general impression he was not able to hold a mental set for any length of time and therefore, could not form an intention for any significant length of time.

*   *   *

He seemed generally confused and he was so confused that I doubt he was able to develop an intention with regard to anything. In the acute schizophrenic state the person's ability to maintain a mental set or given mental state is very low and that is a prerequisite for forming intention. An intention is a type of plan, but if you are that confused and that disorganized, you are not able to form an intention.

Dr. Anthony Petrilli, board certified in both psychiatry and neurology, began treating Gregory six months after the accident and was continuing to do so at the time of the doctor's January, 1987, deposition. Dr. Petrilli diagnosed Gregory as suffering from both the preexisting schizophrenia and organic brain syndrome secondary to a closed head injury to the left temporal area of the brain caused by the February 20 events. Asked his opinion as to whether Gregory intentionally injured himself on that date, Dr. Petrilli opined

that Gregory Mattson did not know what he was doing on that day. That in my professional experience, schizophrenics are totally unpredictable, they generally respond to voices or command phenomena where they have or hear things or feel compelled to do things. They'll do things in a very, very sudden, dramatic fashion such as suddenly jumping out of a window, suddenly putting a gun

to their chest, shooting themselves. They do things, not uncommonly, jumping off bridges or walking into traffic because of these command voices, delusions, hallucinations.

The record developed during plaintiff's case in chief included the following admissions made to Gregory's medical personnel in November, 1983:

I was walking in the street and I jumped in front of a car. I wasn't happy with the way I was living.

\* \* \*

Patient states that he jumped in front of the car because he was unhappy living with his mother and father. Patient states that for six months prior to automobile accident he was living alone, which he enjoyed, and spent his time reading sci-fi novels. Patient states he did not have many friends. Patient denies any delusions, hallucinations or paranoid ideation prior to automobile accident.

\* \* \*

I'm not thinking about killing myself. I thought about it at that time because I got fired from my job.

\* \* \*

I tried to commit suicide by jumping in front of a car. I wasn't happy with my life. But I don't feel that way anymore. I found out that suicide could be hazardous to your health.

\* \* \*

I felt I could kill myself, but I was wrong; I tried to get in front of a car so it would kill me. It didn't.

As these excerpts reveal, the jury was presented with extensive and conflicting testimony concerning Gregory Mattson's state of mind on February 20, 1983. The testimony of the three psychiatrists, viewed in a light most favorable to plaintiff, could

support a finding by a reasonable juror that Gregory Mattson, on that day, was so profoundly mentally disturbed that he could appreciate neither the nature of his acts nor their probable consequences. That being so, a reasonable juror could have found that Gregory Mattson did not intend to bring about his injuries or death when he threw himself in front of several automobiles. Such a conclusion admittedly would be at war with Gregory's own statements some six months after the fact. However, the truthfulness and accuracy of those statements was for the jury to determine, particularly in light of his intervening closed head injury, adjudication of mental incompetency and denial of the pre-accident delusions or hallucinations noted by his treating psychiatrist.

Counsel for plaintiff invites us to hold that Gregory's mental illness precludes a finding that he intended to bring about his own injuries or death. We decline the invitation. Although mental illness, more particularly psychosis in any of its myriad manifestations, is relevant in establishing intent, it is not dispositive. Those who are insane may "intend" to write, to sleep, to die. The issue, for purposes of the no-fault statute, is not the source or motive for the intent, but merely its existence. We need say no more than our colleagues said in *Allstate Ins Co v Miller,* 175 Mich App 515, 521-522; 438 NW2d 638 (1989), ". . . when a person cannot form an intent to act because of insanity, he or she has not acted 'intentionally' as that term is used in insurance policies . . . ."

The question in this case was whether Gregory Mattson intended both the act of hurling himself in harm's way and the resulting injuries or death. The answer turns on the relative weight assigned

to the psychiatric testimony and Gregory's admissions. The question should have been answered by a jury because reasonable minds could differ.

The challenge to the admission of Gregory's statements has not been preserved for appeal because the grounds raised on appeal were not raised at trial, MRE 103(a)(1); *Joba Construction Co, Inc v Burns & Roe, Inc,* 121 Mich App 615, 626; 329 NW2d 760 (1982), and the grounds raised at trial were not raised on appeal, *Muilenberg v The Upjohn Co,* 115 Mich App 316, 325; 320 NW2d 358 (1982), lv den 418 Mich 946 (1984).

Reversed and remanded for new trial. Costs to appellants.